**[ORAL ARGUMENT SCHEDULED MAY 16, 2025]**

Nos. 25-5091, 25-5132

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

Plaintiffs are National Treasury Employees Union, National Consumer Law Center, National Association for the Advancement of Colored People, Virginia Poverty Law Center, Eva Steege, Ted Steege, and CFPB Employee Association. Defendants are Russell T. Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, and the Consumer Financial Protection Bureau.

District court amici are Tzedek DC, 203 Members of Congress, and the States of New York, New Jersey, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia. Janice Wolk Grenadier filed a motion to intervene in district court, but her intervention motion was denied.

No amici or intervenors have appeared in this Court.

## B.    Rulings Under Review

Appellants have appealed the memorandum opinion and the order granting plaintiffs' motion for a preliminary injunction in *National Treasury*

*Employees Union v. Vought*, No. 25-381 (D.D.C.) (Jackson), Dkts. 87, 88

(JA633-747), as well as the court's order enjoining defendants from

implementing their subsequent reduction in force, Dkt. 113 (JA892-98).

## C.    Related Cases

This case has not previously been before this Court, and counsel is

aware of no other related cases currently pending in this court or in any

other court.

*/s/ Catherine Padhi*
Catherine Padhi

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION .......................................................2

STATEMENT OF THE ISSUES ............................................................3

PERTINENT STATUTES ......................................................................3

STATEMENT OF THE CASE.................................................................3

    A.    Statutory Background.......................................................3

    B.    Factual Background ..........................................................4

    C.    This Litigation.................................................................8

SUMMARY OF ARGUMENT.................................................................12

STANDARD OF REVIEW .....................................................................15

ARGUMENT............................................................................................15

I.    The Government Is Likely To Succeed Because Plaintiffs' Claims Are Not Justiciable......................................................................16

    A.    The District Court Lacks Jurisdiction Over Plaintiffs' Claims.............................................................................17

    B.    Plaintiffs Lack A Cause Of Action. ................................29

II.    The Preliminary Injunction Rests On Legal And Factual Error And Should Be Vacated. ......................................................................40

    A.    The District Court Applied An Incorrect Legal Standard..........40

B.     The District Court's Conclusion That Defendants Intend To Close CFPB Is Unsound..................................................................44

C.     The Preliminary Injunction Is Vastly Overbroad. .......................53

III.    The Remaining Factors Favor Vacatur. ...................................................58

CONCLUSION ........................................................................................65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders,*
   430 U.S. 99 (1977) ..............................................................................20

*American Fed'n of Gov't Emps. v. Trump,*
   929 F.3d 748 (D.C. Cir. 2019) ................................................... 29, 39

*Anderson v. City of Bessemer,*
   470 U.S. 564 (1985) ..........................................................................47

*Anglers Conservation Network v. Pritzker,*
   809 F.3d 664 (D.C. Cir. 2016) ........................................................41

*AT&T v. Equal Emp't Opportunity Comm'n,*
   270 F.3d 973 (D.C. Cir. 2001) ........................................................35

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................... 32, 35

*Bluewater Network, In re,*
   234 F.3d 1305 (D.C. Cir. 2000) ................................................. 42, 43

*Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991) ............................................................................39

*Buchanan v. Evans,*
   439 U.S. 1360 (1978) ........................................................................54

*California Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019) ........................................................33

*Case v. Morrisette,*
   475 F.2d 1300 (D.C. Cir. 1973) ......................................................46

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..........................................................58

*Cheney, In re*,
    544 F.3d 311 (D.C. Cir. 2008) ..........................................................62

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................ 1, 25

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) ................................................ 42, 43, 62

*Cobell v. Norton*, 334 F.3d 1128, 1140 (D.C. Cir. 2003)......................................61

*Core Commc'ns, Inc., In re*,
    531 F.3d 849 (D.C. Cir. 2008) ................................................... 42, 59

*Cuddy v. Carmen*,
    762 F.2d 119 (D.C. Cir. 1985) ................................................... 15, 46

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ...................................................................19

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................... 32, 34, 37

*Dayton Bd. of Educ. v. Brinkman*,
    433 U.S. 406 (1977) ...................................................................58

*Department of Justice v. FLRA*,
    981 F.2d 1339 (D.C. Cir. 1993) .................................................. 30, 38

*DRG Funding Corp. v. Secretary of Hous. & Urban Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996) .........................................................36

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) .....................................................................28

vi

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................. 26, 56

*Federal Express Corp. v. U.S. Dep't of Commerce*,
    39 F.4th 756 (D.C. Cir. 2022) ................................................... 38

*Filebark v. Department of Transp.*,
    555 F.3d 1009 (D.C. Cir. 2009) ................................................ 29

*Flyers Rights Educ. Fund, Inc. v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ................................................... 59

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................... 25

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .................................................................. 32

*FTC v. Standard Oil Co.*,
    449 U.S. 232 (1980) .................................................................. 36

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ..................................... 30, 31, 37-38, 38

*Gill v. Whitford*,
    585 U.S. 48 (2018) .................................................................... 54

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
    560 F.3d 495 (D.C. Cir. 2009) ................................................... 29

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) .................................................................. 27

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................. 25

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................ 27, 63

*Independent Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) ...........................................................31

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ...................................................................38

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................ 21, 22

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) ......................................... 20, 22, 31, 34, 40

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) ...........................................................16

*Missouri v. Jenkins,*
  515 U.S. 70 (1995) ....................................................................19

*National Park Hosp. Ass'n v. Department of the Interior,*
  538 U.S. 803 (2003) ................................................................ 20, 21

*Navy Chaplaincy, In re,*
  697 F.3d 1171 (D.C. Cir. 2012) ........................................................15

*Nken v. Holder,*
  556 U.S. 418 (2009) ...................................................................58

*Norton v. Southern Utah Wilderness All.,*
  542 U.S. 55 (2004) .................................... 30, 41, 43, 45, 61

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ................................................... 28, 38

*OPM v. AFGE,*
 No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ........................................25

*Puerto Rico v. United States,*
 490 F.3d 50 (1st Cir. 2007) ..............................................................................40

*Raines v. Byrd,*
 521 U.S. 811 (1997) ..................................................17-18, 18, 19, 22

*Sampson v. Murray,*
 415 U.S. 61 (1974) ........................................................................... 54, 59

*Schlesinger v. Reservists Comm. to Stop the War,*
 418 U.S. 208 (1974) ......................................................................19

*Sealed Case No. 98-3077, In re,*
 151 F.3d 1059 (D.C. Cir. 1998) ...........................................................62

*Spokeo v. Robins,*
 578 U.S. 330 (2016) ......................................................................19

*Telecommunications Research & Action Ctr. v. FCC,*
 750 F.2d 70 (D.C. Cir. 1984) ..................................................... 42, 43

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) .........................................................................17

*United States v. Armstrong,*
 517 U.S. 456 (1996) .........................................................................53

*United States v. Fausto,*
 484 U.S. 439 (1988) ................................................................ 27-28, 28

*United States v. Hallford,*
 816 F.3d 850 (D.C. Cir. 2016) ...........................................................47

*United States v. U.S. Gypsum Co.,*
  333 U.S. 364 (1948) .................................................................................46

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
  *State, Inc.,*
  454 U.S. 464 (1982) ....................................................................... 18, 19

**Statutes:**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................3
  12 U.S.C. § 5301 *et seq.* ..........................................................................3
    12 U.S.C. § 5491(a) ............................................................................45
    12 U.S.C. § 5493(b) ..............................................................................4
    12 U.S.C. § 5493(c)(2) ......................................................................49
    12 U.S.C. § 5493(d)-(e) .......................................................................4
    12 U.S.C. § 5493(g) ..............................................................................4
    12 U.S.C. § 5511(a) ..............................................................................4
    12 U.S.C. § 5512(b)(1) .........................................................................4
    12 U.S.C. § 5531(b) ..............................................................................4
    12 U.S.C. § 5535(a) ............................................................................26

5 U.S.C. § 551(6) .........................................................................................34

5 U.S.C. § 551(13) ............................................................... 30, 32, 34, 37

5 U.S.C. § 704 ..............................................................................................30

5 U.S.C. § 706(1) ................................................................. 14, 21, 39, 41, 42

5 U.S.C. §§ 7101-7135 ...............................................................................28

28 U.S.C. § 1292(a) ......................................................................................2

28 U.S.C. § 1331 ...........................................................................................2

**Regulatory Materials:**

Exec. Order No. 14210,
  90 Fed. Reg. 9669 (Feb. 11, 2025) ........................................................................6

Federal Acquisition Regulation 52.242-15 ..........................................................64

Federal Acquisition Regulation 52.249-2 ..........................................................64

**Legislative Material:**

S. Rep. No. 111-176 (2010) .................................................................. 3-4

**Other Authorities:**

Fed. Student Aid, U.S. Dep't of Educ., *Help*,
  https://perma.cc/QE56-7DNT .................................................................. 26

J. Roberts, *Article III Limits on Statutory Standing*,
  42 Duke L. J. 1219 (1993) .................................................................56

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFPB | Consumer Financial Protection Bureau |
| CSRA | Civil Service Reform Act of 1978 |
| NAACP | National Association for the Advancement of Colored People |

**INTRODUCTION**

The district court entered an extraordinary injunction preventing the new leadership of the Consumer Financial Protection Bureau (CFPB) from running the agency in line with the President's policy initiative to reform the federal bureaucracy to better serve the American public. This Court has already stayed significant portions of that erroneous injunction, and it should now vacate the injunction entirely.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). This case exemplifies the dangers of inviting the judiciary into matters that lie well beyond its constitutional role. Plaintiffs brought a sweeping, programmatic challenge to the operations of an executive agency, seeking not to remedy a specific legal wrong, but to subject the entire operation of an agency to judicial supervision. Rather than recognizing this challenge for what it is—an impermissible attempt to enlist the courts in supervising the day-to-day workings of the Executive— the district court strayed far beyond the proper boundaries of Article III and into territory our Constitution reserves for the Executive Branch.

The district court thus issued a preliminary injunction that usurps Article II authority and frustrates the ability of politically accountable leaders to carry out Presidential directives. It did so without jurisdiction, in the absence of any cause of action, and on the basis of a single, mistaken premise: that defendants plan to close the Bureau and thus prevent it from performing its statutory duties. And to make matters worse, the court made no attempt to tailor its sweeping injunction to address the purported violations it identified or to redress any resulting harms to plaintiffs.

Because the law forecloses plaintiffs' attempt to prevent the Executive Branch from taking lawful measures to reform the agency in conformity with the President's instructions, and because the equities strongly favor removing the improper constraints the district court placed on the Article II officials responsible for running the Bureau, this Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA22. The district court entered a preliminary injunction on March 28, JA745-47, and a subsequent injunction restraining defendants' reduction in force on April 18, JA892-98. Defendants timely appealed. JA748-49, JA899. This Court has jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUES

1. Whether plaintiffs' preemptive challenge to CFPB's overall operation is justiciable, and whether plaintiffs have a valid cause of action under which to bring such a programmatic challenge.

2. Whether the district court erred in concluding that defendants plan to close CFPB entirely and in entering an overbroad injunction that sweeps far beyond what is necessary to address the purported legal violations the court identified and any resulting harms to plaintiffs.

3. Whether the equities favor vacatur to permit politically accountable Executive Branch officials to manage the Bureau absent judicial constraints during this litigation.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

In 2010, Congress created the CFPB as part of a series of reforms enacted in response to the 2008 financial crisis. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified at 12 U.S.C. § 5301 *et seq.*); *see* S. Rep. No. 111-176, at 2

(2010). The Dodd-Frank Act transferred to CFPB certain consumer financial protection authorities of several existing agencies, and it created other new powers not previously exercised. The statute directs CFPB "to implement and, where applicable, enforce Federal consumer financial law" to ensure, among other things, that consumer financial markets are "fair, transparent, and competitive." 12 U.S.C. § 5511(a).

In service of these goals, the statute requires CFPB to establish units to, among other things, conduct consumer finance research, provide financial education services, and collect and track consumer complaints in a centralized database. *See* 12 U.S.C. § 5493(b); *see also id.* § 5493(d)-(e), (g). It also gives CFPB broad discretion to supervise providers of financial services, impose reporting requirements, take various enforcement actions, and promulgate rules prohibiting "unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service." *Id.* § 5531(b); *see id.* § 5512(b)(1).

### B.    Factual Background

Following the January 2025 presidential transition, CFPB underwent significant leadership changes and an accompanying period of internal reassessment. While initial communications and actions caused the district

court to believe the Administration intended to wind down all agency operations, subsequent developments—including clarifications from new Bureau leadership—made clear that the Bureau will remain open and continue performing its congressionally mandated duties.

**1.** On January 31, the President appointed Treasury Secretary Scott Bessent as CFPB's Acting Director. JA641-42. Shortly thereafter, on February 7, the President appointed Russell Vought, the Director of the Office of Management and Budget, as CFPB's new Acting Director. JA643. Under Bessent's and Vought's leadership, the agency instituted a temporary freeze on certain activities while it conducted a broader evaluation of CFPB's operations. For instance, on February 3, Acting Director Bessent directed staff to refrain from taking certain actions without approval, including issuing rules or guidance, commencing or settling enforcement actions, and making most litigation filings. JA642.

On February 8, Acting Director Vought sent a similar email directing staff not to undertake these and other tasks "unless expressly approved by the Acting Director or required by law." JA644. Two days later, on February 10, he sent an email directing staff not to perform any work tasks without approval from CFPB's new Chief Legal Officer, Mark Paoletta.

JA646. Concurrently, growing protests and disruptions at CFPB headquarters prompted security concerns, and agency leadership directed employees not to come into the office. JA645; JA104-06.

In addition to these internal directives, leadership took certain discretionary steps to streamline the agency's operational footprint. *See* JA240. For instance, agency leadership began plans to cancel the headquarters lease based on a determination that the office space was unnecessary for the agency's needs. *See* JA106. On February 11, consistent with the President's directive to optimize the federal workforce, CFPB terminated approximately 85 probationary employees. JA648; *see* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). The agency also instructed staff to begin vacating office space and canceling nonessential contracts. JA648-49. Around the same time, CFPB informed the Federal Reserve that it would not require new funding for the third quarter of fiscal year 2025, because existing funds "were sufficient for the Bureau to carry out its statutory mandates for the next fiscal quarter." JA107-08 ¶ 26.

**2.** As the new leadership team evaluated CFPB's operations, it made clear that it remained committed to fulfilling statutory obligations. JA240-41 ¶¶ 3-4 (noting that since the week of February 10, "a great deal has

evolved at the CFPB"); JA106 ¶¶ 19-20. As Chief Operating Officer Adam Martinez explained, the new agency leadership is not seeking a "closure of the agency," but is instead focused on "running a substantially more streamlined and efficient bureau" with "refocus[ed] … priorities," while ensuring that the agency continues to "perform each of [its] critical statutory responsibilities." JA240-41 ¶¶ 3-4.

This perspective was reflected in communications to agency staff. On February 27, Martinez assured various divisions that "statutorily required work and/or work required by law are authorized." JA658-59. On March 2, Paoletta sent an all-hands email emphasizing that "[e]mployees should be performing work that is required by law and do not need to seek prior approval to do so." JA662; *see* JA661 ("On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work…"). This email highlighted that earlier communications regarding work stoppage had excepted tasks "required by law" or identified how to seek express approval, and explained that "[t]hese measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties." JA661. Thus, regardless of any earlier

confusion, leadership made clear by early March that CFPB would remain open and continue to perform all functions required by law.

## C. This Litigation

Plaintiffs are two CFPB employee organizations, three consumer advocacy organizations, and the husband of a deceased pastor with student loans. JA22-24 ¶¶ 13-18; Dkt. 84.

**1.** On February 13, 2025, plaintiffs filed an amended complaint alleging, as relevant here, that CFPB's actions violate the separation of powers and the Administrative Procedure Act (APA). JA18-49. Plaintiffs sought a temporary restraining order and administrative stay later that day. Dkt. 10. Upon the parties' agreement, the Court converted plaintiffs' motion into a motion for a preliminary injunction and entered a consent order imposing temporary restrictions on defendants while the motion remained pending. JA99-100; *see also* Dkts. 53, 71 (notices of agreement).

The district court held an evidentiary hearing on March 10-11. Plaintiffs continued to argue that the agency was improperly winding down its operations. *See* JA701, JA706. The government presented evidence showing that while CFPB had initially undertaken a broad reassessment of all aspects of its operation, it had since clarified its commitment to

maintaining statutorily required functions while emphasizing that leadership continued to evaluate how best to allocate personnel in accordance with the administration's priorities. *See* JA729.

On March 28, the district court issued a preliminary injunction. The court found that plaintiffs were likely to succeed on the merits of their APA and constitutional claims challenging the alleged closure of the Bureau, concluding that the agency's early actions supported the conclusion that it had exceeded its authority by initiating a stop to statutorily required functions. *See* JA667, JA693-733. In reaching this decision, the court dismissed the Bureau's repeated assurances—including leadership statements—as insufficient to dispel concerns that a "plan" to "shut the agency down entirely" is "unchanged" and that "defendants have absolutely no intention of operating the CFPB at all." JA697. The court expressed skepticism about defendants' representations and declared that continued judicial oversight was necessary to prevent CFPB's closure.

On that basis, the court entered an eight-part injunction requiring CFPB to, among other things, rehire all terminated employees, reinstate all terminated contracts, and refrain from engaging in reductions-in-force or attempting to stop work through any means. JA633-747.

**2.** Defendants appealed, and this Court issued a partial stay pending appeal on CFPB's motion. First, this Court stayed the requirement that defendants rehire terminated employees "insofar as it requires defendants to reinstate employees whom defendants have determined, after an individualized assessment, to be unnecessary to the performance of defendants' statutory duties." Stay 1. Second, it stayed the restrictions on defendants' authority to terminate employees and undertake reductions in force "insofar as it prohibits defendants from terminating or issuing a notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties." *Id.* Third, it stated that the work-stoppage provision would remain in effect only on the understanding that it "allow[s] work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties." Stay 1-2. The other provisions remain in effect, including the prohibition on defendants' ability to finalize the termination of any contract.

Consistent with this Court's stay order, Paoletta and his colleagues conducted a unit-by-unit assessment and determined how many

employees in each office were necessary for CFPB to fulfill its statutory duties. JA756 ¶¶ 6-7. These figures summed to approximately 200 employees to be kept on staff, and on April 17, the agency sent reduction-in-force notices to the remaining employees. JA758 ¶ 21. These employees will remain on paid administrative leave for 60 days. JA758 ¶ 22.

**3.** The same day, plaintiffs moved for an order to show cause why the reduction in force did not violate the partially stayed preliminary injunction. Dkt. 105. After a hearing the following morning, the district court entered an order "suspend[ing]" the reduction in force "until [the court] has ruled on plaintiffs' motion to enforce the preliminary injunction." JA898. The court did not find that defendants had failed to conduct a particularized assessment. Instead, it set an evidentiary hearing for April 28 (at which senior CFPB officials must be available to testify, *see* Minute Order (April 21, 2025)), and it authorized discovery into defendants' process in advance of the hearing. JA896.

That evening, on April 18, defendants moved this Court to enforce or clarify its stay order, and filed a notice of appeal of the district court's most recent injunction suspending the new reduction in force; that motion remains pending. Plaintiffs subsequently moved for the district court to

"clarify that its order is a temporary restraining order," Dkt. 116, at 2. The district court granted that motion the following morning.

## SUMMARY OF ARGUMENT

The district court erred legally, factually, and equitably in entering a preliminary injunction.

**I.A.** The district court lacks jurisdiction over plaintiffs' sweeping and prospective challenge to CFPB's overall operation, which is based on a collection of disparate grievances that are not themselves justiciable. First, plaintiffs lack standing to pursue their central claim that the government intends to close CFPB in violation of the separation of powers. All citizens share an interest in the independence of each branch of government, but this generalized interest is far too abstract to satisfy Article III and is not redressable in any event.

Plaintiffs offer two principal theories of injury beyond their broad interest in policing the boundaries between Congress and the Executive Branch, but neither gives rise to a justiciable claim. Plaintiffs' concerns that CFPB will stop providing services that they rely on do not amount to a certainly impending injury redressable by a court order. And any employment-related grievances must be adjudicated through the

comprehensive scheme Congress established for the resolution of federal-employment disputes. Plaintiffs may not circumvent these jurisdictional barriers by aggregating such claims into one broader dispute about the agency's future operation.

**B.** Plaintiffs also lack a cause of action. The APA permits review only of final agency action, but there is no agency action, much less final agency action, for the court to review. Plaintiffs cannot overcome this defect by recasting their claim as a nonstatutory challenge to *ultra vires* conduct. Such extraordinary claims are available only when plaintiffs would otherwise lack any method of vindicating their rights, and Congress has established statutory mechanisms for vindicating any particularized interests plaintiffs have asserted here.

**II.** Independent of the multiple threshold defects in plaintiffs' claims, the preliminary injunction should be vacated because it is premised on legal and factual error.

**A.** The district court failed to apply the correct legal framework. Where a plaintiff alleges an agency has failed to perform a duty required by statute, that claim must be evaluated and remedied under the mandamus-like standard for agency action unlawfully withheld or

unreasonably delayed under 5 U.S.C. § 706(1)—a standard the district court ignored and plaintiffs cannot satisfy.

**B.** The district court's conclusion that defendants plan to close CFPB cannot be reconciled with the record in its entirety or with the presumption of regularity. That conclusion was based on the district court's legal error in treating a legal argument made by counsel as a factual concession; the court clearly erred on that basis alone. And the court further clearly erred in determining that defendants were intent on closing the agency despite the many manifestations from the agency's new leadership that they intend to fulfill the Bureau's statutory duties.

**C.** Regardless, under any standard and apart from factual errors, the preliminary injunction's sweeping provisions prohibiting lawful management tools available to agencies that undoubtedly remain operational far outstrips any relief that could be warranted in light of a purported closure.

**III.** The equitable balance strongly favors vacatur. Plaintiffs have not identified any grave and irreparable harm. Lost employment generally does not qualify as irreparable harm, and plaintiffs have experienced no delay in receiving any required statutory services, let alone the sort of

14

egregious delay that could support relief for a claim of unlawfully withheld agency action. The preliminary injunction meanwhile interferes with significant swaths of Executive Branch discretion to manage its day-to-day affairs and prevents leadership from implementing the President's directives to streamline federal agencies. At minimum, this Court should vacate those provisions that most significantly trench on the Executive Branch's discretion in managing the Bureau—provisions 2, 3, 4, and 7—along with the now-past compliance-reporting requirement in provision 8.

## STANDARD OF REVIEW

This Court reviews legal questions de novo, factual questions for clear error, and the entry of injunctive relief for an abuse of discretion. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). This Court will find clear error even where "there is some evidence supporting a finding" if the entirety of the evidence leaves it "with the definite and firm conviction that a mistake has been committed." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985) (quotation marks omitted).

## ARGUMENT

To justify the extraordinary remedy of a preliminary injunction, plaintiffs must establish that "(1) they are likely to succeed on the merits of

their APA claims, (2) [they] are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. As part of establishing a likelihood of success on the merits, [plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) (citation omitted).

## I.    The Government Is Likely To Succeed Because Plaintiffs' Claims Are Not Justiciable.

Plaintiffs are associations of agency employees, as well as organizations and individuals who benefit from CFPB services. They allege that the government intends to close the agency, causing the wrongful termination of employees and the cessation of statutorily required services. As explained below, no such plan exists. *Infra* pp. 46-53. But if plaintiffs ever do suffer discrete and concrete injuries from CFPB's implementation of the alleged plan, plaintiffs could obtain administrative and judicial review through the remedial schemes Congress established. Plaintiffs may not circumvent those legislative choices—or various jurisdictional hurdles—by bundling their potential grievances together and repackaging them as a preemptive strike against CFPB's overall management.

## A. The District Court Lacks Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' chief contention is that the government is planning to shut CFPB down in violation of the statute establishing the Bureau, and thus the separation of powers. Beyond this generalized interest in policing the boundaries between branches, plaintiffs offer two principal theories of injury. Several allege that they have benefitted from CFPB services and fear harm if those services cease. The remaining plaintiffs represent current or former CFPB employees who allege injuries related to their actual or expected loss of employment. These alleged injuries, no matter how they are packaged, do not give rise to a justiciable case or controversy.

**1.a.** Plaintiffs lack standing to bring a broad, prospective challenge to CFPB operations. Under Article III, federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches," but to redress concrete injuries to specific interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). "This requires, among other things, that the plaintiff have suffered an invasion of a legally protected interest which is … concrete and particularized, and that the dispute is traditionally thought to be capable of resolution through the judicial process[.]" *Raines v. Byrd*,

521 U.S. 811, 819 (1997) (first alteration in original) (citation and quotation marks omitted). This requirement serves in part to ensure that disputed legal questions "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). When "reaching the merits of the dispute would force [the courts] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines*, 521 U.S. at 819-20.

Plaintiffs' principal contention is that the Executive Branch is encroaching on the Legislative Branch's prerogatives by closing an agency established by statute. This interest in vindicating the separation of powers is exactly the sort of abstract and generalized grievance that cannot be redressed by a federal court under Article III.

First, even assuming the truth of plaintiffs' allegations, a generalized dispute over whether an agency will perform its statutory duties or will have sufficient resources to do so involves no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution

through the judicial process." *Raines*, 521 U.S. at 819. Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo v. Robins*, 578 U.S. 330, 341 (2016). Quite the contrary, such disputes over the size and scope of the Federal Government have long been left to the "hurly burly" of the political process.

Second, plaintiffs lack a particularized interest in safeguarding the separation of powers, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 226-27 (1974). This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.*; *Valley Forge*, 454 U.S. at 482-83. Third, such a programmatic injury is not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

**b.** For many of the same reasons, plaintiffs' challenge is not ripe for review. While ripeness and standing can overlap, the ripeness doctrine protects the executive from "judicial interference" before the challenged government action "has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Ripeness therefore "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted). Instead of rushing into court, plaintiffs must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to [their] situation in a fashion that harms or threatens to harm [them]." *Id.* at 808 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). To evaluate ripeness, courts look to (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.*

Here, both factors counsel against review. First, plaintiffs present the kind of "abstract disagreemen[t] over administrative policies" that are unfit

for judicial resolution. *National Park,* 538 U.S. at 807. Article III courts exist to resolve claims arising from concrete injuries arising in specific factual settings, but plaintiffs improperly seek preemptive judicial review of the management of the entire agency. Second, denying review at this stage will not impose any legally cognizable hardship: If CFPB does take any action causing plaintiffs a concrete injury for which they can seek redress, plaintiffs can challenge that specific action in the normal course. As explained below, plaintiffs who fear a loss services that CFPB is required to provide may, if denied such services, bring an APA action to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). And plaintiffs concerned about unlawful terminations may seek review through the comprehensive scheme Congress established for federal-employment disputes. *See infra* pp. 27-29. Plaintiffs' desire for earlier judicial intervention than what Congress has provided for is not a cognizable hardship justifying premature review.

Plaintiffs are not the first to bring a suit "challeng[ing] a more generalized level of Government action" instead of "specifically identifiable Government violations of law." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992). The Supreme Court has recognized the appeal of

such an approach from a plaintiff's perspective, especially one with institutional interests: The case-by-case adjudication of concrete disputes arising in concrete factual settings is "assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire." *National Wildlife Fed'n*, 497 U.S. at 894. Nonetheless, the Court has steadfastly insisted that programmatic challenges are "rarely if ever appropriate for federal-court adjudication." *Defenders of Wildlife*, 504 U.S. at 568. Article III justiciability requirements are "built on [the] single basic idea … of separation of powers"—and "[i]n light of [the] overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, [courts] must put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines*, 521 U.S. at 819-20.

**2.** Beyond their generalized grievances, several plaintiffs—the NAACP, the National Consumer Law Center, the Virginia Poverty Law Center, and an individual with student loans—allege harm because they fear CFPB will stop performing its statutorily required duties. But they fail to allege concrete and redressable injuries sufficient to establish standing.

In analyzing the NAACP's standing, the district court pointed to two allegations of organizational injury and one allegation of injury to one of its members, but none satisfies Article III. The court first stated that the NAACP had "demonstrated the necessary injury in fact" because a loss of CFPB services would "impede" the NAACP's ability to "protect and educate its members on consumer financial protection issues." JA685-86. As for specifics, the NAACP was "forced to cancel *plans to provide CFPB resources*" at upcoming conferences "'to protect [the association's] members … from financial harm.'" *Id.* (emphasis added). The court also pointed to a declaration stating that the NAACP had "anticipated continu[ed] … collaboration" with CFPB in holding joint "education calls for NAACP members across the country," but that such collaboration would end if CFPB shuts down. JA58-59; JA685-86. Assertions that an organization had hoped to collaborate with an agency and share agency resources with its members do not come anywhere close to establishing an injury in fact. Were it otherwise, any organization with a policy disagreement could manufacture standing on the strength of nothing more than an unfulfilled aspiration to collaborate with the agency. Article III is not so easily circumvented.

The district court also credited the NAACP's assertion that one of its members suffered an injury in fact because she was a target of financial scams after losing her home in a recent fire. This member's declaration does not, however, establish any injury relevant to CFPB's services. She states that by "early February 2025," *other* unidentified "NAACP members were already taking advantage of the Bureau's assistance to help them avoid predatory financial schemes." JA217-18. But she states only that she "was intending to take advantage of and rely on such assistance" at some unidentified time. *Id.* A vague intention to use agency services cannot suffice—especially when unsupported by any details about what the individual needed from the agency and might fail to get.

The standing analysis for the other two consumer advocacy organizations, National Consumer Law Center and Virginia Poverty Law Center, is similarly sparse, as neither group has alleged a concrete, imminent, and redressable injury. The National Consumer Law Center uses CFPB-provided information in creating its own publications, and it worries that it may lose access to these "essential resources upon which it has relied to do its core work." JA82. But "threatened injury must be *certainly impending* to constitute injury in fact"; these conjectures are at

best "allegations of possible future injury[,] [which] are not sufficient" to satisfy Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) (granting government's stay application because organizations' allegations that they may be denied agency services are, "under established law, … presently insufficient to support" standing). The organization's expectation that its own work could increase to meet consumer needs if CFPB stops providing useful services, *see* JA687-88, is inadequate for the same reason. Moreover, even if such an injury were imminent, a mere "setback to the organization's abstract social interests" is insufficient to satisfy Article III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

The National Consumer Law Center also alleged that CFPB canceled both a subscription to its publications and a training series it planned to provide to CFPB staff. JA687. It did not, however, allege that CFPB must subscribe to this publication or use its trainings to fulfill the agency's statutory obligations, nor would such an allegation be plausible. Such an injury is very unlikely to be redressed by a favorable judgment on claims that, as here, concern CFPB's fulfillment of its statutory obligations.

The district court briefly concluded the Virginia Poverty Law Center had standing based on the organization's assertion that it "relies on CFPB's … assist[ance] … in providing aid to consumers who call [its] helpline," absent which its "consumer-protection mission" would be "much harder." JA688. Such a conclusory statement unsupported by any further factual detail does not satisfy Article III's standing requirements. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Finally, the court addressed Pastor Eva Steege's allegation that CFPB had been helping her enroll in the Public Service Loan Forgiveness Program. JA688-89. The court concluded that Pastor Steege alleged an injury in fact based on her allegation that CFPB canceled a follow-up meeting because the Private Education Loan Ombudsman had been terminated. *Id.* But as the government explained, this ombudsman assists borrowers with *private* student loans, not public ones, and Pastor Steege's allegations concern only public loans. Dkt. 31, at 33-34; 12 U.S.C. § 5535(a) (directing "Private Education Loan Ombudsman" to "provide timely assistance to borrowers of private education loans"); Fed. Student Aid, U.S. Dep't of Educ., *Help*, https://perma.cc/QE56-7DNT (explaining that private education loans are ineligible for Public Service Loan Forgiveness).

Pastor Steege's allegation thus has nothing to do with CFPB's statutory obligation to maintain a "Private Education Loan Ombudsman," and any judgment concerning this statutory obligation would not have redressed her injuries.[1]

**3.** The district court lacked jurisdiction over claims arising from plaintiffs' employment-related injuries, as any such claims must be pressed through the statutorily prescribed channels for litigating federal employment disputes.

The Civil Service Reform Act of 1978 (CSRA) sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service. *United States v. Fausto,*

---

[1] The district court suggested that this disconnect between statutory duties and Pastor Steege's allegations could be overcome because the ombudsman had "dealt with federal student loan issues regularly" in prior administrations. JA738. But the court did not and could not suggest that it could order the resumption of any such courtesies, which are plainly an exercise of agency discretion. *See Haaland v. Brackeen,* 599 U.S. 255, 294 (2023) (redressability requires the court to award relief "through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion"). The suggestion that such a grievance concerning core agency discretion—which would never be justiciable on its own, *see Heckler v. Chaney,* 470 U.S. 821, 831-32 (1985)—is fit for judicial resolution only underscores that this sweeping challenge to CFPB's operation is being used to circumvent limits on the judicial role.

484 U.S. 439, 445 (1988). The CSRA includes the Federal Service Labor-Management Relations Statute, which governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135. Through this scheme, Congress "regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (quoting *Fausto*, 484 U.S. at 443). As a result, the CSRA provides the "exclusive means" for vindicating injuries relating to federal employment. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012).

The district court erred in permitting plaintiffs to circumvent this comprehensive scheme by repackaging employment-related claims as a generalized challenge to broader agency action. While the court expressly acknowledged the government's argument that the court lacked subject matter jurisdiction over claims concerning federal employment matters, it determined that it "need not decide now whether it can or should address [the] legality" of these claims because, "at this point, [the court's] focus is the closure of the agency as a whole." JA685 n.15.

That reasoning is flatly incompatible with precedent and invites end-runs around the CSRA. Federal employees may not circumvent the statute by framing their employment-related challenge as a broad administrative challenge or, more generally, as seeking relief that they could not secure under the CSRA. *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009). As this Court has repeatedly explained, "Congress designed [this] remedial scheme with care, 'intentionally providing—and intentionally not providing—particular forums and procedures for particular kinds of claims.'" *Id.* (quoting *Filebark v. Department of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009)). Under the CSRA, "what you get … is what you get," *id.*—and this principle applies to claims concerning individual employees and broader labor-management practices alike, *see American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 761 (D.C. Cir. 2019) (holding that unions' claims fall within the CSRA's ambit).

### B. Plaintiffs Lack A Cause Of Action.

Even if plaintiffs could establish jurisdiction, their challenge would fail for want of a cause of action. Plaintiffs identify two potential causes of action; neither suffices. First, the APA is unavailable because it authorizes courts to review only "final agency action," which is absent here. Likely

recognizing this obstacle, plaintiffs bring essentially the same claim under a theory of nonstatutory review of *ultra vires* action; but they fall far short of making the "nearly insurmountable" showing necessary to bring such an extraordinary claim. *Department of Justice v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993).

**1.** It is well settled that not all agency conduct is subject to APA review. Rather, the APA authorizes judicial review of only "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. As relevant here, that limitation raises two questions: First, whether the act at issue qualifies as an agency "action" under the APA; and second, whether that action is "final." *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).

**a.** As the Supreme Court has explained, a reviewable "action" is limited to the set of "circumscribed, discrete agency actions" identified in the APA's definition of "action"—that is, "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). *See Norton v. Southern Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 62 (2004). This definition, while expansive, is "not so all-encompassing as to authorize [courts] to exercise judicial review [over]

30

everything done by an administrative agency." *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (second alteration in original) (quotation marks omitted). Importantly, the APA—reflecting constitutional limits on the judicial role—does not permit "general judicial review of [an agency's] day-to-day operations," *National Wildlife Fed'n*, 497 U.S. at 899; nor does it authorize agencies to oversee "the common business of managing government programs," *Fund for Animals*, 460 F.3d at 20. Indeed, "[m]uch of what an agency does is in *anticipation* of agency action"—and not itself "action" under the APA. *Id.* at 19-20 (emphasis added).

Agency plans, strategies, or goals fall outside the APA's defined list of agency actions. "Unlike [the] circumscribed, discrete agency actions that are the ordinary subjects of judicial review," a plan can represent "the sum of many individual actions, including some yet to be taken." *Fund for Animals*, 460 F.3d at 20 (quotation marks omitted). Thus, "plans themselves are generally unreviewable"; instead, "it is only [the] specific actions implementing the plans that are subject to judicial scrutiny." *Id.* at 20-21. Put differently, the object of review must be the "concrete action applying the" plan, not the overall plan or goal the agency seeks to achieve. *Id.*

**b.** Even if a challenged act qualifies as an "action" found in 5 U.S.C. § 551(13), it is not reviewable unless it is "final" within the meaning of the APA. An action is considered final only if it "mark[s] the 'consummation' of the agency's decisionmaking process," and if it is one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

With respect to this second criterion, the "core question" is whether the agency action "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). This requirement means that intermediate decisions are not reviewable, even if they play a crucial role in a process that ultimately affects the party seeking review.

The Supreme Court examined this principle in *Dalton v. Specter*, 511 U.S. 462 (1994), which concerned a challenge to the closure of a naval shipyard. The relevant statute required the Secretary of Defense to submit recommendations for the closure of military bases to a commission, which would submit a report to the President. *Id.* at 465. The President then had two weeks to approve or disapprove the commission's recommendations in their entirety. *Id.* Plaintiffs sought APA review of these recommendations, but the Court held that they were not final agency

actions. *Id.* at 468. The recommendations were necessary steps in the process, but the *final* action was taken by the President: "Without the President's approval, no bases are closed under the Act…." *Id.* at 470. The Court acknowledged that the President's authority was constrained by the earlier action in that he could not "pick and choose among bases" to close, but this limitation was "immaterial." *Id.* "What is crucial is the fact that the President, not the Commission, takes the final action that affects the military installations." *Id.* (alterations and quotation marks omitted).

For these reasons, this Court has stressed that the finality requirement calls on courts to "remain laser focused on whether the [challenged act] gives rise to 'direct and appreciable legal consequences,'" or whether the consequences materialize only at a later stage. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019). Thus, for instance, a memorandum announcing an agency's final interpretation of law is not final for APA purposes, even if it "unequivocally declares" the agency's "definitive" position and "forecasts" "in no uncertain terms" how the agency would proceed. *Id.* at 637-38. The memorandum's effect would not be felt until the agency implemented it, *id.* at 640-41, and thus the

memorandum itself, although definitive, was necessarily nonfinal. *See Dalton*, 511 U.S. at 470.

**2.** Under these principles, there is no reviewable final agency action here. In concluding otherwise, the district court pointed to two agency determinations—an email sent on February 10 and a "decision" (according to the court's own inference) to close the agency. Neither was agency action, much less final agency action.

**a.** The February 10 email, which directed staff not to perform any work tasks without approval from the agency's Chief Legal Officer, is precisely the sort of day-to-day operational decision that is unreviewable under the APA. *See National Wildlife Fed'n*, 497 U.S. at 899. This email cannot reasonably be characterized as matching any of the identified "agency actions" reviewable under the APA. *See supra* p. 30 (citing 5 U.S.C. § 551(13)). The only conceivable match is an "order," but no one would naturally describe this email as the "disposition … of an agency in a matter." 5 U.S.C. § 551(6) (definition of "order"). It was instead an intra-agency instruction "to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties." JA661. If such an email is agency action,

nearly all internal directives from agency management would be reviewable under the APA.

In any event, the email cannot possibly be "final" agency action, because it neither "mark[ed] the 'consummation' of the agency's decisionmaking process," nor did it itself have any "direct and appreciable legal consequences" that would be felt in the absence of any further official action. *Bennett,* 520 U.S. at 178; *see also AT&T v. Equal Emp't Opportunity Comm'n,* 270 F.3d 973, 975 (D.C. Cir. 2001) (explaining that for an action to be final, it "must have inflicted an actual, concrete injury upon the party seeking judicial review" (alteration and quotation marks omitted)).

As for the first prong, the February 10 email was not issued at the completion of any proceeding, and like most emails, it contained no indicia of formality and finality associated with the "consummation" of an agency's decisionmaking process. Rather, it was sent by the Acting Director just minutes into his first business day on the job. *See* JA646 (email sent at 8:30 a.m. on Monday, February 10); JA1058 (noting Acting Director Vought's appointment the evening of Friday, February 7). Like hundreds of other email directives sent from agency management across the federal government each day, this email was subject to further clarification and

refinement from management: Later agency emails clarify that this February 10 email should not be understood as an instruction to stop statutorily required work. *Supra* pp. 7-8. To the extent the district court considered these later instructions a shift in the agency's position instead of a clarification, JA717-18, that determination would only underscore the point: Even under the district court's view, the instructions in the February 10 email were subject to change—and not fit for judicial review. *Cf. DRG Funding Corp. v. Secretary of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (explaining that the APA's finality requirement "serves several functions," including by "allow[ing] the agency an opportunity to apply its expertise and correct its mistakes," and "reliev[ing] the courts from having to engage in 'piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary'" (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980)).

As to the second *Bennett* prong, the district court's own reasoning illustrates that the February 10 email did not itself have the "direct and appreciable" effect on plaintiffs necessary to demonstrate finality. Here, the district court emphasized that the email had "consequences," and it examined how the email played a role in subsequent decisions to terminate

probationary employees, end contracts, and carry out reductions in force. *See* JA674-77 (documenting decisions made "in accordance with the Acting Director's guidance of February 10," (alteration and quotation marks omitted)). But the court identified not one instance in which the email alone, without any subsequent act, directly affected plaintiffs. Because these effects were contingent on future action, the email is not final agency action reviewable under the APA. *See Dalton*, 511 U.S. at 470.

**b.** The district court's separate determination that agency management had decided to close CFPB fares no better. To start, this conclusion is a product of the court's own inferences; neither plaintiffs nor the court point to any specific moment, and certainly no consummation of any decisionmaking process, at which agency management made such a decision. That alone establishes that there has not been reviewable "agency action"; there is simply no "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" to point to. 5 U.S.C. § 551(13).

Regardless, such a decision would not be reviewable even if it had been made after a careful deliberative process and reduced to a formal and definitive planning document. A plan—no matter how decisive—is only a preliminary step along the way to a final action. *Fund for Animals*, 460 F.3d

at 22. So while actions that implement a plan could be final agency action; the plan or goal itself is not. *Id.* at 21-22. Thus, even if there had been a formal decision to close the agency, and even if there were a document "outlin[ing] the goals and methods" to be used in achieving that objective, neither the decision nor the plan itself would be reviewable. *Id.* at 20.

**3.** Plaintiffs cannot circumvent the APA's final agency action requirement by recasting the same claim as a nonstatutory claim challenging ultra vires agency action. JA695 n.19.

An ultra-vires claim is only available to obtain injunctive relief against agency action taken "in excess of its delegated powers and contrary to a specific prohibition" in the law. *Federal Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). Ultra-vires claims "are confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Id.* at 764 (alteration omitted). The strict limitations on nonstatutory review are "nearly insurmountable." *Department of Justice v. FLRA*, 981 F.2d at 1343; *see Nyunt*, 589 F.3d at 449 (describing this claim as "essentially a Hail Mary pass" that "rarely

succeeds"). As particularly relevant here, plaintiffs bringing such a claim must show that the denial of judicial review would "wholly deprive [them] of a meaningful and adequate means of vindicating" their rights. *Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).

Plaintiffs have an adequate means of vindicating their rights, although they may not do so in the broad, generalized, and premature form they attempt to use here. As explained above, plaintiffs raise two principal theories of injury: some fear losing access to services they allege CFPB is statutorily required to provide; others fear wrongful termination. Congress has established familiar frameworks for addressing each type of harm. First, if plaintiffs are denied access to a required agency service, they may bring an APA claim to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Second, plaintiffs may raise their employment-related claims "in the context of concrete … disputes" through the comprehensive framework set forth in the CSRA. *American Fed'n of Gov't Emps.*, 929 F.3d at 757; *supra* pp. 27-29.

The "case-by-case approach" prescribed by these frameworks may be "understandably frustrating" to plaintiffs because they seek "across-the-board" relief, but it is "the traditional, and remains the normal, mode of

operation of the courts." *National Wildlife Fed'n*, 497 U.S. at 894. And while plaintiffs would prefer to bring a preemptive, programmatic challenge to defendants' management choices, they have made no showing that the congressionally provided mechanisms for review are "somehow constitutionally insufficient and hence [they] must have a nonstatutory cause of action to vindicate" their rights. *Puerto Rico v. United States*, 490 F.3d 50, 60 (1st Cir. 2007).

## II. The Preliminary Injunction Rests On Legal And Factual Error And Should Be Vacated.

The threshold defects in plaintiffs' claims alone establish that the preliminary injunction is unsupported by a likelihood that plaintiffs will succeed on the merits. But even apart from plaintiffs' inability to bring these claims in their current form in the present action, the preliminary injunction is premised on legal and factual errors that warrant vacatur.

### A. The District Court Applied An Incorrect Legal Standard.

The district court fundamentally erred in addressing plaintiffs' claims that defendants will "eliminate the CFPB" and "suspend or terminate CFPB's statutorily mandated activities." JA44, JA46-47. As discussed above, the crux of such claims is that CFPB will fail to perform functions it is

40

obliged by statute to carry out, *supra* pp. 22-27, and they are thus governed by the APA's provision permitting courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1). Plaintiffs cannot succeed under 5 U.S.C. § 706(1)'s mandamus-like standard, and the district court's failure to apply it warrants reversal of the preliminary injunction.

**1.** "The only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63. In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act … about which [an official] had no discretion whatever." *Id.* (alterations in original) (citations and quotation marks omitted). Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).

As this Court has made clear, relief under Section 706(1) is controlled by the mandamus standard, and "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent

violations of a clear duty to act." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)). Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). And even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Communications, Inc.*, 531 F.3d at 855 (quoting *Telecommunications Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 79 (D.C. Cir. 1984)). Where there is sufficiently egregious delay in performance of a required duty, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108-09 (D.C. Cir. 2001) (quotation marks omitted). And this Court has noted that "[i]t is proper for a court to allow the government the opportunity to cure" a violation "declared by the court." *Id.* (quotation marks omitted). Indeed, this Court has previously withheld relief, and only retained jurisdiction, once an agency "assured" the Court

"it is now moving expeditiously to resolve" unreasonably delayed duties. *TRAC*, 750 F.2d at 72.

**2.** Rather than applying these well-established standards to plaintiffs' request for preliminary relief, the district court treated plaintiffs' claim as one challenging an agency action. *See* JA671-80. That was error because, as in *SUWA*, there was no "agency action" that plaintiffs could challenge here. *See supra* pp. 34-37; *SUWA*, 542 U.S. at 64. And even if plaintiffs had identified a discrete and statutorily required action that CFPB was in danger of withholding, any relief would have to accord with the remedial principles this Court has announced under Section 706(1). Yet the district court made no attempt to identify any "specific, unequivocal command" such that it could "order[] … a precise, definite act." *SUWA*, 542 U.S. at 63. It found no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater*, 234 F.3d at 1315 (citation omitted). And it certainly declined to stay its hand once the agency "assure[d]" the court it would continue to fulfill its statutory obligations, *TRAC*, 750 F.2d at 72, or to "allow the government the opportunity to cure" any statutory violation it found, *Cobell*, 240 F.3d at 1108-09. The relief the district court granted should be vacated.

## B. The District Court's Conclusion That Defendants Intend To Close CFPB Is Unsound.

The preliminary injunction rests on the district court's conclusion that there remains an "unchanged" effort "to shut the agency down entirely" and that "defendants have absolutely no intention of operating the CFPB at all." JA697; *see also* JA739-40. That conclusion is based on legal error, and to the extent it constitutes a factual finding, it is clearly erroneous.

**1.** The district court briefly conceded that it is "a matter of record," that "the new leadership" who arrived at CFPB several weeks into the new administration took a number of "appropriate steps" to "approve certain activities or reactivate specific contracts related to statutorily mandated activities." JA709-10 (citing Dkts. 56-1, 66-2). Nonetheless, the court disregarded these steps and all the other evidence in the record that defendants had for weeks been attempting to ensure that the Bureau fulfilled its statutory obligations and were committed to doing so going forward. *See, e.g.*, JA634 (concluding that the record "suggest[s] … that the change of heart was more likely a charade for the Court's benefit"); *infra* pp. 53. A key step in the court's analysis turned on an exchange with agency counsel that the court viewed as indicating that "no one—not even

the Acting Director of the agency—knows what it means" to "perform their statutory functions." JA730-31; *see* JA730 (citing JA1291, JA1297).

The court's assessment of this exchange, however, was rooted in legal error. As explained above and at the hearing, the Supreme Court has held that courts may not enter injunctions subjecting agencies to judicial supervision over their implementation of "broad statutory mandates."[2] *SUWA*, 542 U.S. at 66. The district court concluded that counsel's agreement that "the term 'statutorily obligations' is too broad and not enforceable," JA1297-98, was somehow tantamount to "insisting" that "no one" at the agency knows what the agency's obligations are—and then extrapolating from that conclusion that CFPB leadership was insincere in

---

[2] *See supra* pp. 17-22; JA1294-97 (government counsel protesting that "the statutory functions that plaintiffs have identified appear to be literally everything that the Agency does," citing *SUWA*, and urging that "Congress tasked the Agency, not this Court, with going through and figuring out a process for identifying how it's going to comply with each one of [its] statutory obligations" and that "a plaintiff … who is injured by … an individualized failure to act" could bring an action under [5 U.S.C. §] 706[(1)]"). There is no doubt that plaintiffs were indeed seeking the type of broad and unenforceable injunction regarding general statutory provisions that counsel protested against in this exchange, as is clear from plaintiffs' "chart of statutory duties" the district court invoked. JA1290 (citing JA258 (chart including 12 U.S.C. § 5491(a) (providing that CFPB "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws "))).

its repeatedly stated intent to fulfill those obligations, JA730-31. But government counsel made a correct *legal* argument—not a factual concession—in opposing an injunction requiring compliance with "statutory obligations." JA1289-98. The district court's disregard of the legal principle counsel articulated was legal error, and the court's factual inference "induced by [this] erroneous application of the law" cannot stand. *Case v. Morrisette*, 475 F.2d 1300, 1307-08 (D.C. Cir. 1973).

**2.** To the extent the district court found—independent of its legally erroneous assessment of counsel's well-founded protests against a "follow the law" injunction—that defendants intend to close CFPB entirely, this finding is clearly erroneous. *See* JA710 (stating that the Court "cannot find that … the administration ever abandoned its plan to shut the CFPB down"). "[E]ven if there is some evidence supporting a finding, that finding is clearly erroneous if 'on the entire evidence [the reviewing court] is left with the definite and firm conviction that a mistake has been committed.'" *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985) (second alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In light of the record as a whole, the district court clearly erred in determining that the agency would be shut down absent the court's intervention. *See United States v. Hallford*, 816 F.3d 850, 857-58 (D.C. Cir. 2016) (finding clear error where district court relied on an "apparent assumption" rather than "evidentiary support" that a suspect was "still in pain" a day after an emergency-room visit). Once Acting Director Vought assumed his role, he indicated from the start that work "expressly approved by the Acting Director or required by law" could continue. JA644 (quoting Dkt. 23-2 (February 8 email)). The record is replete with evidence from that point on that the agency intends to comply with its statutory obligations—and lacking in any substantial evidence that it plans to stop such compliance absent an injunction. The district court's contrary view turns on mistaken or incomplete descriptions of documents that plainly reflect the agency's intent to fulfill statutory requirements. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985) (explaining that on clear-error

review, "the district court's account of the evidence" must be "plausible in light of the record viewed in its entirety").[3]

First, in describing Vought's February 10 email as an order to cease all work, *see* JA667, JA672, JA674, JA697-98, JA712, the district court routinely failed to note that the email's plain text permits some work, stating that "[i]f there are any urgent matters, please alert [Acting Director Vought] through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task." JA646 (quoting Dkt. 23-4). And when the district court did acknowledge this aspect of the February 10 email, it inaccurately dismissed this important caveat as being "generally" applied by the agency only to "operational needs," like "keeping the lights on" and "effectuat[ing] the [reductions in force]." JA674 n.9. That characterization cannot be squared with the record, which contains

---

[3] The district court's misapprehension of the record is illustrated by its incorrect belief that CFPB's Acting Director, Russell Vought, is also the head of the Office of Personnel Management. Russell Vought is the Director of the Office of Management and Budget, not the Office of Personnel Management. The district court expressly suggested that Vought's purported role at the Office of Personnel Management may have improperly affected his actions at CFPB, *see* JA674-76, and it is impossible to determine in what other ways the court's mistake could have colored its assessment of the record.

multiple instances in the days after February 10 of agency leadership

promptly approving the performance of substantive statutory obligations.[4]

Similarly, the district court mischaracterized other record evidence

that agency leadership approved statutorily required work. For instance,

the court characterized approvals as "primarily related to operations" such

that "the agency was largely doing what was statutorily mandated to

---

[4] *See* Dkt. JA286-87 (February 10 and 11 emails exempting "work to publish the Average Prime Offer Rate … from the stop work order"); JA285 (February 10 email documenting "that the work stoppage will not apply to the Bureau's Consumer Resource Center aka Contact Center Services"); JA298-90 (February 26 email approving request to work on statutorily required report to Congress); JA306 (February 27 email approving Office of Fair Lending's request to perform functions identified in 12 U.S.C. § 5493(c)(2)); JA326 (February 28 email confirming an employee's understanding that they "can resume all regular work related to fulfilling statutory obligations"); JA341-44 (March 2 email approving performance of multiple statutory duties); JA347 (March 2 email granting approval to respond to external stakeholders per statutory duties); JA351-52 (March 3 email documenting "reactivati[on]" of "the work of the Office of Financial Education"); JA374-76 (March 3 email documenting permission to work on list of statutorily required reports); JA385 (March 3 email confirming that the Office of Financial Education "should be performing these statutorily required duties"); JA388 (March 3 email approving a "shift [in] resources needed to comply with the statute and any applicable laws/regulations" regarding the Consumer Complaint Database); JA390-91 (March 3 email approving proposed implementation strategies to perform "statutory obligations and/or work required by law" by the Research, Monitoring, and Regulations division).

manage *itself* internally," such as accommodating disabled employees. JA710. But the very documents the court cites in support of this contention also clearly indicate employees' continuing ability to perform *any* statutory obligation. *See* JA289 (February 21 email confirming that the "Legal Division is authorized to support all operational matters being exercised on behalf of our new leadership *and our regulatory/statutorily requirements*" and directing "[m]ission related support" to be "coordinated directly through [Chief Legal Officer] Mark [Paoletta] or [Deputy Chief Legal Officer] Dan [Shapiro]" (emphasis added)); JA344 (February 27 email not only listing various operational tasks, but also discussing an "immediately required statutorily required activity" involving an update to "the Consumer Advisory Boards charter and Membership Balance Plan," including submission to Congress and issuance of "a Federal Register notice").

Next, these approvals to conduct statutorily required duties accord with agency leadership's follow-up emails explaining that the February 10 email was not intended to stop performance of such duties. On February 27, Chief Operating Officer Martinez emailed various offices "to ensure that [they were] aware that statutorily required work and/or work required by law are authorized," and that the relevant "teams are

50

authorized to continue carrying out these responsibilities." JA316; JA317 (similar). And on March 2, Martinez emailed the whole agency on behalf of Acting Director Vought, noting the February 8 email's preservation of work "'required by law' or expressly approved by the Acting Director" and explaining that the February 10 email directed employees "to reach out … for the authorization" the Director had required. JA338.

The district court dismissed the March 2 email as having "little evidentiary value," positing that it contains a "stunning mischaracterization of the February 10" email. JA716-17. But contrary to the court's reasoning, there is no difficulty "squar[ing]" the March 2 email's description of the February 10 email "with the plain language of the Vought directive." JA717. Vought's directive on February 10—like that on February 8—permitted some work to go forward, and it is unclear why the district court refused to understand "urgent" work as encompassing work "required by law." *See id.* Indeed, the district court's categorical assertion that the March 2 interpretation was not how "the February 10 order was understood by the staff" or "implemented by the agency," *id.*, is flatly at odds with the record. *See* JA318; JA326 (February 28 confirmation that some employees understood that they could "resume all regular work

51

related to fulfilling statutory obligations" based on February 27 email and "discussion").[5]

Finally, the district court's assessment of the evidence wrongly dismisses the agency's stated intent to fulfill statutory duties because that intent was manifested in a way the district court considered "not particularly inviting," "narrow and grudging," or "chilling." JA710-11. There is nothing wrong with an agency taking a "very narrow approach" to spending or seeking "justifications" for such spending that will withstand external scrutiny. JA711 (quoting Dkt. 56-1, at 96, 98-99). The district court's disapproval of such management methods is hardly a reasoned basis for disregarding the plain text of emails approving the restoration of contracts without which the Bureau "can't meet a statutory requirement." JA378 (emphasis omitted).

---

[5] The district court's incredulity that such understanding was not universal and that agency leadership encountered confusion during this period, *see* JA679 (citing *Casablanca*), underscores the Supreme Court's wisdom in warning against programmatic injunctions that interfere with the Executive Branch's ability to manage agencies. To those engaged in the day-to-day work of running an agency, it should be unsurprising that on-the-ground uncertainty can result from politically accountable officials' efforts to dramatically shift an agency's priorities.

Throughout its analysis, the district court's treatment of the record as a whole improperly disregarded the presumption of regularity that applies to actions of Executive officers in the course of their official duties. *See United States v. Armstrong,* 517 U.S. 456, 464 (1996). "[C]lear evidence" is required to rebut this presumption, *id.*, but the district court dismissed significant portions of the record based on its view that other evidence "suggested" improper motives. *See* JA634 (stating that other evidence "suggest[ed]" that the government's actions to ensure compliance with statutory obligations "were nothing more than window dressing" and "more likely a charade for the Court's benefit"). Any such suggestions fall far short of the clear evidence that might justify the court's failure to accord the Executive Branch the presumption of regularity that should have attended its review of the record here.

### C.    The Preliminary Injunction Is Vastly Overbroad.

Even apart from the district court's errors regarding the appropriate standard for compelling an agency to perform statutory duties, the preliminary injunction is so overbroad as to warrant vacatur. Per the "familiar rule," "once a … violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the …

violation." *Buchanan v. Evans*, 439 U.S. 1360, 1362 (1978) (Brennan, J., in chambers) (alterations and quotation marks omitted). Indeed, constitutional and equitable principles require that such extraordinary relief be no broader than necessary. *Cf. Gill v. Whitford*, 585 U.S. 48, 73 (2018). And where an injunction trenches on the Executive Branch's "dispatch of its own internal affairs," which courts should give "the widest latitude," courts are "quite wrong [to] routinely appl[y] … the traditional standards governing more orthodox stays." *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974).

Here, the preliminary injunction suffers from a fundamental, reversible error—it imposes sweeping and intrusive requirements on the Executive Branch's management of its internal affairs that go far beyond anything necessary to achieve its stated purposes of keeping the agency open and performing its statutory duties. Rather, the injunction broadly inserts the court into agency management decisions entirely disconnected from the agency's continued existence or ability to fulfill statutory obligations.

Take the injunction's effect on the ability of CFPB's politically accountable leadership to manage the size of its workforce. The district

court required CFPB to rehire *all* terminated employees without regard for whether these employees were necessary for the agency to carry out its statutory functions. JA746. Nor can the agency terminate a single such employee "except for cause related to the individual employee's performance or conduct." *Id.* The district court indicated that such language permits "routine workplace management," JA753, but there is nothing routine about exposing an agency to the threat of contempt proceedings over disputes about whether it had adequate cause to terminate an employee. Indeed, the injunction has already exposed CFPB to contempt proceedings based on workforce management. *See infra* pp. 62 n.6 (describing the district court's inquiry into the adequacy of CFPB's assessment about the resources it needs to satisfy its statutory obligations).

The district court's order denying a stay pending appeal underscores that it lacked a basis to prohibit CFPB from undertaking *any* reduction in force, including one that would not impede the agency's ability to meet statutory requirements. The district court made plain that its decision to prohibit reductions in force was based not on a conclusion that such reductions are illegal or necessarily leave an agency unable to fulfill statutory requirements, but rather on its view that CFPB's reduction-in-

force plans are "not a routine operation." JA753. A court's view that an agency is taking non-routine actions is hardly a foundation for the extraordinary remedy of an injunction.

The injunction's effect on CFPB's contracting authority is similarly intrusive and similarly disconnected from the district court's stated goal of ensuring CFPB remains open to fulfill its statutory obligations. The injunction requires that the Bureau rescind *all* notices of contract termination issued after February 11, regardless of whether the contract was terminated consistent with the agency's statutory obligations and in reflection of adjusted priorities. *See* JA747. The injunction also prohibits CFPB from finalizing any subsequent contract termination, even if the agency has "halted" that contract "based on an individualized assessment" that "the contract involved is unnecessary for the agency to fulfill its statutory functions." *Id.* The court's determination that its injunction should extend to any contract termination across the entire agency exemplifies its failure to appreciate the "properly limite[d] role of the courts in a democratic society." *Alliance for Hippocratic Med.*, 602 U.S. at 380 (quoting J. Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993) (quotation marks omitted)). Agencies routinely enter into

and terminate contracts based on their needs and priorities, and the district court has no basis for curtailing the agency's discretion to do so merely to further the stated goal of keeping the agency open.

At base, the preliminary injunction is built on a contradiction: to ensure that the Bureau remains open and functional, the district court enjoined the Bureau's political leadership from using ordinary management tools available to all open and functioning agencies. The district court opined that the "agency is either open or it's not," and declared that it was issuing the preliminary injunction for the purpose of ensuring that CFPB remains "open." JA678; *see also*, *e.g.*, JA633, JA635, JA693, JA733. Yet agencies that remain fully "open" possess broad discretion to allocate resources and make personnel decisions, under the control of politically appointed leadership. Remarkably, the district court provided no explanation—anywhere in its 100-plus page opinion—why it is necessary to impose the injunction's broad requirements to ensure that the Bureau satisfies its minimum statutory responsibilities.

This fundamental mismatch between the purported legal violation found and the sweeping relief ordered warrants vacatur. An injunction broader than necessary to address the problem identified by the district

court is reversible error. *See, e.g.*, *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 418-19 (1977) (concluding there was a "disparity between the evidence of constitutional violations and the sweeping remedy finally decreed" and that it was "clear that the presently mandated remedy cannot stand upon the basis of the violations found by the District Court"). To the extent this Court concludes there is any possible basis for any relief, the most appropriate course would be to vacate the overbroad preliminary injunction and remand to the district court to consider the matter afresh in light of this Court's guidance.

## III. The Remaining Factors Favor Vacatur.

Plaintiffs have not established irreparable injury, and any such harm would plainly be outweighed by the government's and the public's interest, which "merge" here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**1.** To begin, plaintiffs' failure to establish irreparable harm is reason alone to vacate the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The district court concluded that plaintiffs' established irreparable harm because plaintiffs may lose their employment or access to CFPB services absent an injunction, and because one plaintiff had died. JA734-38. None of these determinations withstands

58

scrutiny. First, as the Supreme Court has explained, terminations of federal employees will generally "not support a finding of irreparable injury, however severely" the discharge "may affect a particular individual." *Sampson*, 415 U.S. at 92 & n.68.

Second, the feared loss of access to agency services cannot amount to irreparable harm warranting preliminary relief: As explained above, agency-inaction claims require not just an unreasonable delay, but delay "so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855. Where the applicable legal framework requires such an extraordinary showing to secure *any* relief, granting a preliminary injunction before any delay in services has materialized—and certainly before any delay has become egregious—would short-circuit the deferential standards under which courts evaluate such claims. *See Flyers Rights Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017).

Finally, the district court stated that one plaintiff was at a risk of irreparable harm if she died before obtaining relief, but erred in concluding, without explanation, that prospective relief is warranted on the grounds that plaintiff's death means that "[t]he irreparable harm … has already come to pass." JA738.

**2.** On the other side of the ledger, the district court's injunction inflicts irreparable constitutional harm on the government at every turn. It frustrates the public's interest in having the Executive Branch effectuate the President's policy priorities—including by reducing the federal government's operational footprint—through lawful direction. It inserts the Judicial Branch into the day-to-day, internal operations of a federal agency, impinging on its flexibility to shift resources and make staffing decisions—tools essential to agency management. And given the sweeping and intrusive restrictions, it locks the agency into a static operational structure that prevents leadership from determining how best to fulfill the agency's statutory obligations consistent with the President's policy priorities.

Worse yet, the order exposes the government to the risk of contempt proceedings and other sanctions over wide swaths of agency-administration matters. While the injunction lasts, routine and lawful firings could prompt contempt proceedings. The same is true of the agency's decision to halt contract work, with its determination about what is "unnecessary for the agency to fulfill its statutory functions" subject to second-guessing in court. JA747. Such judicial supervision over an agency's

exercise of lawful discretion is unwarranted and impermissible, but it will continue, potentially for many months, unless the injunction is vacated. *See SUWA*, 542 U.S. at 66-67. That risk is especially concerning because the district court appears poised to require mini-trials, discovery, and testimony from senior officials—all to probe into the bases for defendants' determinations about what resources are necessary for the continued performance of statutory duties. *See* JA896 (permitting discovery and setting hearing to examine the bases for the defendants' determinations); Minute Order (April 21, 2025) (requiring Mark Paoletta to be available to testify). This invasive inquiry undertaken under the unstayed portions of the preliminary injunction—apparently in an attempt to look behind senior officials' discretionary determinations regarding staffing levels necessary to fulfill the Bureau's statutory duties—highlights the injunction's incursion on Article II prerogatives. *See, e.g.*, *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *Cobell v. Norton*, 334 F.3d 1128, 1140 (D.C. Cir. 2003); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998).

**3.** At a minimum, this Court should vacate or modify the portions of the district court's injunction that most severely intrude on the agency's

day-to-day operations, including the restriction on the agency's ability to

manage its contracts.[6]

Provisions 2 and 3 of the injunction require the reinstatement of all

probationary and term employees, regardless of circumstance, and prevent

any reductions of force, even if such reductions would not affect the

agency's ability to carry out its statutorily mandated activities. *See* JA746.

Together, these provisions effectively eliminate all Executive discretion

over huge swaths of personnel matters—even those unrelated to agency

closure or statutory requirements. Indeed, they prevent even ordinary

staffing adjustments routinely made by new administrations.

Provision 4 similarly reaches far beyond what is necessary to ensure

the agency's continued operation by preemptively prohibiting temporarily

pauses in work activities while agency priorities are reassessed. *See* JA746.

_____

[6] This Court's partial stay of the injunction reflects the immediacy of defendants' need for relief and should have mitigated some of the most disruptive restrictions on agency discretion. Recent developments in district court, however, reveal the practical difficulties of leaving in place portions of the injunction going forward. Ongoing proceedings aimed at enforcing the unstayed portions of the injunction—in ways that defendants have explained do not align with this Court's stay order—underscore the burdens of even a pared-back injunction. *See* Mot. to Enforce or Clarify 1, 5-6, 9-11 (April 18, 2025). These developments counsel against leaving in place even portions of the injunction.

Such pauses can serve legitimate management purposes and are an important tool of agency management during presidential transitions. Preserving such Executive Branch discretion is particularly important for agencies that—like CFPB—have enforcement discretion requiring evaluation of "the many variables involved in the proper ordering of [agency] priorities." *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (noting the "general unsuitability for judicial review of agency decisions to refuse enforcement"). By broadly prohibiting work stoppages, the injunction unnecessarily intrudes on day-to-day operations and enforcement discretion.

Although not included in this Court's partial stay, provision 7 of the injunction should also be vacated. It requires reinstatement of all terminated contracts regardless of whether any given contract is consistent with current agency priorities or necessary to fulfill any statutory duties. It also prohibits the agency from finalizing any subsequent decision to terminate a contract—even if the agency has "halted" the contract because, for example, the contractor's performance is unsatisfactory. This restriction harms the agency because contractors can incur reasonable costs—for which the government will be responsible—until the contract is

terminated. *See* Federal Acquisition Regulation 52.242-15. Thus, if the contractor reasonably determines it is necessary to keep project managers assigned to the contract to ensure continuity if work is resumed, or to retain contractors with technical expertise and specialized knowledge that would be difficult to replace, the government may be responsible for paying for this continued staffing even though no work is being performed on the contract. By contrast, if a contract is terminated, the contractor must settle all outstanding liabilities and, crucially, may not incur new ones. *See* Federal Acquisition Regulation 52.249-2. This provision of the injunction, which by its very terms burdens routine contract management *unrelated* to agency closure, cannot be justified as necessary to ensure CFPB's continued operation.

Finally, consistent with vacatur of these substantive provisions, this Court should also vacate provision 8, which requires the agency to certify its compliance with the injunction.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and vacate the preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON

 */s/ Catherine Padhi*
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*
  *catherine.m.padhi@usdoj.gov*

APRIL 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,953 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

_/s/ Catherine Padhi_
Catherine Padhi

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

_/s/ Catherine Padhi_
Catherine Padhi

# ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 551............................................................................................... A1

5 U.S.C. § 704............................................................................................... A3

5 U.S.C. § 706............................................................................................... A4

12 U.S.C. § 5491.......................................................................................... A5

12 U.S.C. § 5493.......................................................................................... A5

12 U.S.C. § 5512.......................................................................................... A13

12 U.S.C. § 5535.......................................................................................... A13

**5 U.S.C. § 551. Definitions**

For the purpose of this subchapter—

　　(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

　　　　(A) the Congress;

　　　　(B) the courts of the United States;

　　　　(C) the governments of the territories or possessions of the United States;

　　　　(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

　　　　(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

　　　　(F) courts martial and military commissions;

　　　　(G) military authority exercised in the field in time of war or in occupied territory; or

　　　　(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix;

　　(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

　　(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a

party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency —
    (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;
    (B) withholding of relief;
    (C) imposition of penalty or fine;
    (D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(F) requirement, revocation, or suspension of a license; or
(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—
(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;
(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or
(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

## 5 U.S.C. § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise

requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**5 U.S.C. § 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> (D) without observance of procedure required by law;

>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 12 U.S.C. § 5491. Establishment of the Bureau of Consumer Financial Protection

(a) Bureau established

There is established in the Federal Reserve System, an independent bureau to be known as the "Bureau of Consumer Financial Protection", which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Bureau shall be considered an Executive agency, as defined in section 105 of Title 5. Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of Title 5, shall apply to the exercise of the powers of the Bureau.

* * *

## 12 U.S.C. § 5493. Administration

* * *

(b) Specific functional units

    (1) Research

    The Director shall establish a unit whose functions shall include researching, analyzing, and reporting on—

        (A) developments in markets for consumer financial products or services, including market areas of alternative consumer financial products or services with high growth rates and areas of risk to consumers;

        (B) access to fair and affordable credit for traditionally underserved communities;

        (C) consumer awareness, understanding, and use of disclosures and communications regarding consumer financial products or services;

        (D) consumer awareness and understanding of costs, risks, and benefits of consumer financial products or services;

(E) consumer behavior with respect to consumer financial products or services, including performance on mortgage loans; and

(F) experiences of traditionally underserved consumers, including un-banked and under-banked consumers.

(2) Community affairs

The Director shall establish a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities.

(3) Collecting and tracking complaints

(A) In general

The Director shall establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. The Director shall coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate.

(B) Routing calls to States

To the extent practicable, State agencies may receive appropriate complaints from the systems established under subparagraph (A), if—

(i) the State agency system has the functional capacity to receive calls or electronic reports routed by the Bureau systems;

(ii) the State agency has satisfied any conditions of participation in the system that the Bureau may establish, including treatment of personally identifiable information and sharing of information on complaint resolution or related compliance procedures and resources; and

(iii) participation by the State agency includes measures necessary to provide for protection of personally identifiable information that conform to the standards for protection of the confidentiality of personally identifiable

information and for data integrity and security that apply to the Federal agencies described in subparagraph (D).

(C) Reports to the Congress

The Director shall present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services. Such report shall include information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints.

(D) Data sharing required

To facilitate preparation of the reports required under subparagraph (C), supervision and enforcement activities, and monitoring of the market for consumer financial products and services, the Bureau shall share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity. The prudential regulators, the Federal Trade Commission, and other Federal agencies shall share data relating to consumer complaints regarding consumer financial products and services with the Bureau, subject to the standards applicable to Federal agencies for protection of confidentiality of personally identifiable information and for data security and integrity.

(c) Office of Fair Lending and Equal Opportunity

(1) Establishment

The Director shall establish within the Bureau the Office of Fair Lending and Equal Opportunity.

(2) Functions

The Office of Fair Lending and Equal Opportunity shall have such powers and duties as the Director may delegate to the Office, including—

(A) providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are

enforced by the Bureau, including the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act;

(B) coordinating fair lending efforts of the Bureau with other Federal agencies and State regulators, as appropriate, to promote consistent, efficient, and effective enforcement of Federal fair lending laws;

(C) working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education; and

(D) providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate.

(3) Administration of Office

There is established the position of Assistant Director of the Bureau for Fair Lending and Equal Opportunity, who—

(A) shall be appointed by the Director; and

(B) shall carry out such duties as the Director may delegate to such Assistant Director.

(d) Office of Financial Education

(1) Establishment

The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions.

(2) Other duties

The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—

(A) financial counseling, including community-based financial counseling, where practicable;

(B) information to assist with the evaluation of credit products and the understanding of credit histories and scores;

(C) savings, borrowing, and other services found at mainstream financial institutions;

(D) activities intended to—

(i) prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;

(ii) reduce debt; and

(iii) improve the financial situation of the consumer;

(E) assistance in developing long-term savings strategies; and

(F) wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.

(3) Coordination

The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—

(A) working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and

(B) working with the research unit established by the Director to conduct research related to consumer financial education and counseling.

(4) Report

Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—

(A) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Financial Services of the House of Representatives.

(5), (6) Omitted

(7) Study and report on financial literacy program

(A) In general

The Comptroller General of the United States shall conduct a study to identify—

(i) the feasibility of certification of persons providing the programs or performing the activities described in paragraph (2), including recognizing outstanding programs, and developing guidelines and resources for community-based practitioners, including—

(I) a potential certification process and standards for certification;

(II) appropriate certifying entities;

(III) resources required for funding such a process; and

(IV) a cost-benefit analysis of such certification;

(ii) technological resources intended to collect, analyze, evaluate, or promote financial literacy and counseling programs;

(iii) effective methods, tools, and strategies intended to educate and empower consumers about personal finance management; and

(iv) recommendations intended to encourage the development of programs that effectively improve financial education outcomes and empower consumers to make better informed financial decisions based on findings.

(B) Report

Not later than 1 year after July 21, 2010, the Comptroller General of the United States shall submit a report on the results of the study conducted under this paragraph to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.

(e) Office of Service Member Affairs

(1) In general

The Director shall establish an Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families intended to—

(A) educate and empower service members and their families to make better informed decisions regarding consumer financial products and services;

(B) coordinate with the unit of the Bureau established under subsection (b)(3), in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State agency; and

(C) coordinate efforts among Federal and State agencies, as appropriate, regarding consumer protection measures relating to consumer financial products and services offered to, or used by, service members and their families.

(2) Coordination

(A) Regional services

The Director is authorized to assign employees of the Bureau as may be deemed necessary to conduct the business of the Office of Service Member Affairs, including by establishing and maintaining the functions of the Office in regional offices of the Bureau located near military bases, military treatment facilities, or other similar military facilities.

(B) Agreements

The Director is authorized to enter into memoranda of understanding and similar agreements with the Department of Defense, including any branch or agency as authorized by the department, in order to carry out the business of the Office of Service Member Affairs.

(3) Definition

As used in this subsection, the term "service member" means any member of the United States Armed Forces and any member of the National Guard or Reserves.

(f) Timing

The Office of Fair Lending and Equal Opportunity, the Office of Financial Education, and the Office of Service Member Affairs shall each be established not later than 1 year after the designated transfer date.

(g) Office of Financial Protection for Older Americans

(1) Establishment

Before the end of the 180-day period beginning on the designated transfer date, the Director shall establish the Office of Financial Protection for Older Americans, the functions of which shall include activities designed to facilitate the financial literacy of individuals who have attained the age of 62 years or more (in this subsection, referred to as "seniors") on protection from unfair, deceptive, and abusive practices and on current and future financial choices, including through the dissemination of materials to seniors on such topics.

(2) Assistant director

The Office of Financial Protection for Older Americans (in this subsection referred to as the "Office") shall be headed by an assistant director.

(3) Duties

The Office shall—

> (A) develop goals for programs that provide seniors financial literacy and counseling, including programs that—
>
>> (i) help seniors recognize warning signs of unfair, deceptive, or abusive practices, protect themselves from such practices;
>> (ii) provide one-on-one financial counseling on issues including long-term savings and later-life economic security; and
>> (iii) provide personal consumer credit advocacy to respond to consumer problems caused by unfair, deceptive, or abusive practices;
>
> (B) monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive;
>
> (C) not later than 18 months after the date of the establishment of the Office, submit to Congress and the Commission any legislative and regulatory recommendations on the best practices for—
>
>> (i) disseminating information regarding the legitimacy of certifications of financial advisers who advise seniors;
>> (ii) methods in which a senior can identify the financial advisor most appropriate for the senior's needs; and
>> (iii) methods in which a senior can verify a financial advisor's credentials;
>
> (D) conduct research to identify best practices and effective methods, tools, technology and strategies to educate and counsel seniors about personal finance management with a focus on—
>
>> (i) protecting themselves from unfair, deceptive, and abusive practices;

    (ii) long-term savings; and

    (iii) planning for retirement and long-term care;

  (E) coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement; and

  (F) work with community organizations, non-profit organizations, and other entities that are involved with educating or assisting seniors (including the National Education and Resource Center on Women and Retirement Planning).

\* \* \*


## 12 U.S.C. § 5512. Rulemaking authority

\* \* \*

(b) Rulemaking, orders, and guidance

  (1) General authority

  The Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof.

\* \* \*


## 12 U.S.C. § 5535. Private Education Loan Ombudsman

(a) Establishment

The Secretary, in consultation with the Director, shall designate a Private Education Loan Ombudsman (in this section referred to as the "Ombudsman") within the Bureau, to provide timely assistance to borrowers of private education loans.

\* \* \*